AUKUSO TOLEAFOA and FA'AI'U TOLEAFOA, Plaintiffs

v.

TIAPULA IMO, FOGAFOGA TIAPULA, and
DOES I-XX, Defendants

High Court of American Samoa
Land and Titles Division

LT No. 10-87

May 11, 1988

Before KRUSE, Associate Justice, TAUANU'U, Chief Associate Judge, and AFUOLA, Associate Judge.

Counsel: For Plaintiffs, Charles Ala'ilima
For Defendants, Edwin Gurr and Faiaoga Mamea

As conceded by plaintiffs, this is not your run of the mill land dispute. The Court is again presented the infrequent occasion to intervene between the family matai and an individual family member who necessarily claims that the actions of the former have transcended the permissible boundaries of "pule" and is in derogation of cognizable rights of the individual family member.

Plaintiff, Faaiu Toleafoa, is a blood member of the Tiapula family of Alao, American Samoa. She is joined by her husband, Aukuso Toleafoa, in this suit against the senior matai (sa'o), Tiapula Imo, seeking relief against the said matai for the latter's alleged actions resulting in the removal of plaintiffs' home and two outer structures (faleo'o) and in damaging assorted crops.

Plaintiffs were designated about a half acre of family lands by the late Tiapula Auina. In 1968 they had built a small structure on the location and moved thereon cultivating an area surrounding the structure. In 1977, plaintiffs rebuilt their living quarters and this essentially consisted of a Samoan type "fale" although covered with roofing iron. The cost of this structure at the time was said to be some $600.00 in materials.

Shortly after this structure was built, plaintiffs moved to the United States in 1979 and Mrs. Toleafoa testified that their primary purpose

118

in moving was the education of their children. Their absence is thus claimed to be temporary.

Following their departure, Mrs. Toleafoa had her brother and then her sister occupy the premises but they in turn moved out to care for their own family homes.

To the date of hearing we find that plaintiffs are basically residing in the United States although there was a period of time when Mr. Toleafoa returned to Samoa in 1983 for the apparent purpose of maintaining the family homestead and to serve the matai. When Mr. Toleafoa returned, he took employment on island and initially stayed at Alao. He also visited his wife and children periodically in the mainland and it was during such an extended visit that the Toleafoas received word that their home and belongings had been removed at the instigation of the matai defendant. Mr. Toleafoa has not since returned to the territory, however Mrs. Toleafoa came to Samoa to meet with the matai and she eventually brought these proceedings.

Defendant matai has held the family's title "Tiapula" since the year 1980 and agreed that plaintiffs' structures were dismantled at his directions as senior matai. Defendant testified that for all intents and purposes, plaintiffs had abandoned their home and site. He was aware that plaintiff Faaiu's sister was last living in the house but she had moved out in 1982. He also testified that in 1983 when Mr. Toleafoa returned to Samoa, said Toleafoa was welcomed back into the family and appointed the "matai taulealea" of Tiapula. However as things turned out, the matai's expectations did not materialize. Toleafoa was said to have rarely visited Alao village, abnegated his duties as matai taulealea and failed to render tautua or participate in family affairs. The defendant further testified that he was embarrassed with complaints regarding the use of plaintiffs' home for frequent drinking bouts by the village youth and with the place left unattended it was overgrown and accumulating a lot of trash.

Consequently at a family meeting called by the matai in 1986, he had instructed the family to dismantle the plaintiffs' structures and clear the overgrowth. Defendant claims that besides notice to the family via the mentioned family meeting, he

119

had specifically told Faaiu's sister, Vaosa who had formerly occupied plaintiffs' home, that the same was to be dismantled and the surrounding lands cleaned up.

For some time, however, no one in the family acted on the matai's instructions and in the following year the matai specifically directed one Natia to dismantle plaintiffs' structures and to clear the land. This was accordingly done and subsequently another structure was erected on the clearing and the same is claimed by the matai as his own.

When word got to the Toleafoas in the United States regarding their structures, Mrs. Toleafoa returned to the territory and confronted the matai. Chief Tiapula testified (and this testimony is corroborated by plaintiff) that his advice to Mrs. Toleafoa was that she concentrate on schooling her children; that upon their return and removal to the territory, a piece of family land will be designated for them. The matai went on to testify that there was more than enough family land to accommodate the plaintiffs upon their return. The consoling attempts by the matai were not acceptable to plaintiffs who now seek damages and an order from the court essentially seeking to undo what has resulted from matai action.

DISCUSSION

At the outset, it is the opinion of this Court that the particular facts of this case do not warrant judicial intervention as any conclusion beyond that would sanction the proposition that an individual family member's right to communal family lands is absolute. Such a conclusion of course is neither grounded in law nor custom.

It is trite observation that a family member's right to use of communal lands is subject to certain conditions. One is that reciprocal obligation to the family through "tautua" to the matai in accordance with custom. Talagu v. Te'o, 4 A.S.R. 121 (1974); Leapaga v. Masalosalo, 4 A.S.R. 868 (1962). The fact that a parcel of land has been designated to a family member for his or her use does not thereby terminate the matai's pule over such land. Pisa v. Solaita, 1 A.S.R. 520 (1964).

The implications of plaintiffs' contentions suggest that somehow this obligation can be put on hold or suspended provisionally for certain purposes. That suspensory purpose advanced here by plaintiffs is the education of their children. Plaintiffs guardedly submit in the alternative that they have substantially satisfied this obligation by participating off-island in fa'alavelave that concerned other absent family members. Necessarily plaintiffs must suggest in connection herewith a somewhat fluid notion of "tautua".

Admittedly the Samoan way of life has been said to be "dynamic" and not "static" and has been amenable to change, <u>Fairholt v. Aulava</u>, 1 A.S.R.2d 73, 76 (1983), and one would have to be blind not to notice that certain forms of tautua in the past are not as readily observable today. But then "tautua" must surely vary from family to family and is in the final analysis a matter more apt for family definition. Thus any invitation to the Court to generalize parameters of what is and is not tautua would be to favor enhancement of the "static" through judicial fiat.

What may be generally stated is that a matai does not, and never has had to, discharge family obligations on his own, and it goes without saying that tautua to the matai ensures communal activity. But then that tautua becomes only an enforceable obligation against those family members occupying and using communal family lands. It is to these family members that the matai can look for traditional services with sanctions. If we were to otherwise prescribe exceptions to the customary obligation of tautua such as extended absence for educating children while permitting the extended encumbrance of communal family lands, then we would surely be adding to custom something not otherwise envisaged, and undoubtedly lacking in any factual foundation whatsoever.

In the present matter, the matai testified that plaintiffs have not rendered service and have not participated in family affairs. The matai's conclusion can hardly be refuted. Plaintiffs in their many years of absence from the territory have not shared in the communal burden with fa'alavelave and obligations to the same extent that confronted the matai and on-island resident members. Further Mr. Toleafoa's return to the territory in 1983 for purposes of tautua and participation in family

121

affairs proved to be more in the way of good intentions rather than substance. Although presented the opportunity, he did nothing more than to positively affirm his own immediate family's lack of tautua and service.

Another recognized limitation to a family member's right to family lands is actual use and occupation of such land. Relinquishment of possession to land causes a reversion of the land back to the matai and family. Talagu v. Te'o, 4 A.S.R. 121 (1974). Relinquishment of possession may be either by voluntary surrender or by abandonment by the family member. Id. at 125. While a family member's intentions may not have been to abandon the land, the issue of whether relinquishment has arisen and the matai has effectively taken over to the exclusion of the family member is "one of fact". Id at 125.

On the facts hereof we are satisfied that relinquishment of possession had occurred after the many years of absence by the plaintiffs. While plaintiff, Faaiu Toleafoa, may argue against relinquishment in that she had both her brother and then sister occupy the premises, we see no more resulting in this than arrangement for the sake of appearances. In substance, both the brother and sister had their own houses to look after which eventually caused both to move out of plaintiffs' home. Indeed the sister Vaosa had in existence for many years her own more permanent structure in the nature of a "palagi" style home, which, as she testified, could not be neglected by her for any length of time. She in turn placed a non-family member to occupy plaintiffs' premises when she moved out but even appearances were no longer evident with this final set up. As far as the matai knew, there was nobody living on the premises which were unattended, overgrown and accumulating a garbage heap. The land itself was doing no one in the family any good; there was no service arising in connection therewith; and the matai from his stance had no idea what plaintiffs' plans were to return to the land, if ever.

In these circumstances, the question naturally arises, what is expected of a matai in the normal course, given the trust reposed upon him to look after family assets. This matai called a family meeting giving notice of his intentions, which notice was specifically given to plaintiffs'

122

immediate relatives on-island. Execution of the matai's directives did not take place for another year and yet in the interim the matai was still left sitting in the dark by those family members whose interest would be affected by his decision making.

On the above alone, a holding would logically follow in favor of the matai, but of interest in this case was that this matai's attitude in court did not really appear to emphasize the above factors in justification. As earlier noted, when he was finally confronted by plaintiffs, and after he had acted, his sentiment was not in the manner of eviction without further ado. Despite the bringing of these proceedings the matai nonetheless committed under oath to be steadfast with the conciliatory attempts he had first tendered plaintiffs, namely, that upon their return to the territory, a similar tract of family property would be ensured them. We can hardly imagine the more reasonable unless such would be that plaintiffs may have their cake and eat it as well.

It is appropriate to pause at this point and consider the cautions of Chief Justice Gardner in <u>Fairholt v. Aulava</u> (Supra), "declining to establish a precedent by which any malcontent family member can willy nilly run to court every time a sa'o makes a family decision with which he disagrees." <u>Id</u>. at 78. The Court here held that as "condition precedent to bringing an action against the sa'o or other family member, the family member must plead and prove a <u>good faith</u> effort has been made to settle the problem with the sa'o and within the family." <u>Id</u> at 78 (emphasis added).

While the evidence disclosed a conference with the sa'o the requirement of "good faith" on the part of family member was far from evident in this case. If any inferences may be drawn, it was that family member had an agenda to take the sa'o to court notwithstanding. Her prayer included damages of $10,000.00 for value of the dismantled home which the evidence at best pointed to $600.00 for building materials. Given ten (10) years of wear and tear, which was probably advanced by neglect, the actual market value of such a Samoan structure is questionable. Good faith? The prayer also seeks $20,000.00 in mental anguish suffered which the evidence at best showed no more than symptomatic of a condition for which common

123

household aspirin would be the better suited relief. Again we question good faith. In circumstances of an extended period of continued absence from the family and family obligations, the refusal by plaintiffs of the matai's offer to be furnished family lands upon their return to the territory - and thereby being in the position to meet customary obligations - is again a question mark on good faith.

As declared in Fairholt (supra) the court's role in intra family disputes is a review one. The court will not substitute its judgment for that of the senior matai, absent a clear abuse of discretion. Such an abuse is clearly absent here on the record.

On the foregoing, it is the conclusion of the Court that plaintiffs have not in any way shown cause for judicial interference in what has otherwise been the proper exercise of matai jurisdiction. We therefore leave it to the matai's good senses to resolve this matter in the manner he had proposed to plaintiffs in the first place and as subsequently promised by him on the witness stand.

We also dismiss the defendant's counter-claim. We note with the last minute change of counsel that the counter-claim was not seriously pursued. This is no reflection on counsel Gurr who substituted for then counsel of record. The counter-claim asked the court to essentially fabricate a lease in retrospect between the parties in order to base a "quantum meruit" claim for rent against plaintiffs. This cause is utterly without merit. The court will construe a lease but it will not create one. The second count of the counter-claim not only mirrors plaintiffs' claim for mental suffering, but also its entire lack of merit. We are equally unable to sustain here on the facts any such cause of action approaching the realm of torts.

It is accordingly ORDERED, ADJUDGED and DECREED.